IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs July 29, 2020

## STATE OF TENNESSEE v. BRANDON D. MIDDLEBROOK

**Appeal from the Criminal Court for Knox County**
**No. 103238A      Bob R. McGee, Judge**

———————————————

### No. E2019-01503-CCA-R3-CD

———————————————

The defendant, Brandon Middlebrook, appeals his 2015 Knox County Criminal Court jury convictions of aggravated burglary, attempted first degree murder, employing a firearm during the commission of a dangerous felony, and unlawful possession of a firearm by a convicted felon, challenging the sufficiency of the convicting evidence and arguing that the trial court erred by permitting the State to use the non-testifying co-defendant's statement to question the defendant at trial. We hold that the trial court erred by permitting the State to cross-examine the defendant using the statement of his co-defendant but that the error can be classified as harmless beyond a reasonable doubt. The evidence is sufficient to support the defendant's convictions of attempted first degree murder. Because the defendant's previous felony convictions do not qualify as prior convictions under the terms of Code section 39-17-1324, the defendant's convictions of employing a firearm during the commission of a dangerous felony after having been previously convicted of a dangerous felony in Counts 3, 7, 11, 15, 19, and 23 are vacated and those charges dismissed. The case is remanded to the trial court for the entry of corrected judgment forms reflecting the proper merger of the remaining convictions of employing a firearm during the commission of a dangerous felony and the imposition of a six-year mandatory minimum period of incarceration for each of those convictions. *See* T.C.A. § 39-17-1324(h)(1). The judgments of the trial court are otherwise affirmed.

**Tenn. R. App. P. 3; Judgments of the Criminal Court Affirmed in Part; Vacated and Remanded in Part**

JAMES CURWOOD WITT, JR., J., delivered the opinion of the court, in which NORMA MCGEE OGLE and D. KELLY THOMAS, JR., JJ., joined.

Gerald L. Gulley (on appeal) and Keith Lowe (at trial), Knoxville, Tennessee, for the appellant, Brandon D. Middlebrook.

Herbert H. Slatery III, Attorney General and Reporter; Nicholas W. Spangler, Assistant Attorney General; Randall E. Nichols, District Attorney General; and TaKisha Fitzgerald, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

The Knox County Grand Jury returned a 32-count indictment charging the defendant and the co-defendant, Joshua Williams, with a variety of offenses related to an incident that occurred in Knoxville on February 4, 2014. Given the complexity of the indictment, we include only those charges applicable to the defendant and present it in table format:

| Count | Charge | |
|-------|--------|---|
| 1 | Especially aggravated burglary of Aundre Buford's residence with the intent to commit theft and where Macee Peterkin suffered serious bodily injury | |
| 2 | Employing a firearm during the commission of a dangerous felony, to wit: especially aggravated burglary | Lesser included offense of Count 3 |
| 3 | Employing a firearm during the commission of a dangerous felony, to wit: especially aggravated burglary, after having been convicted of a dangerous felony | Prior felonies of attempted robbery and aggravated assault |
| 5 | Especially aggravated burglary via the commission of assault and where Macee Peterkin suffered serious bodily injury | Alternative to Count 1 |
| 6 | Employing a firearm during the commission of a dangerous felony, to wit: especially aggravated burglary | This count is identical to Count 2 in all respects. |
| 7 | Employing a firearm during the commission of a dangerous felony, to wit: especially aggravated burglary, after having been convicted of a dangerous felony | This count is identical to Count 3 in all respects. |
| 9 | Attempted first degree murder of Macee Peterkin | Lesser included offense of Count 13 |
| 10 | Employing a firearm during the commission of a dangerous felony, no predicate dangerous felony alleged | Lesser included offense of Count 11. |

-2-

| 11 | Employing a firearm during the commission of a dangerous felony, no predicate dangerous felony alleged, after having been convicted of a dangerous felony | Prior felonies are the same attempted robbery and aggravated assault alleged in Counts 3 and 7. |
|---|---|---|
| 13 | Attempted first degree murder of Macee Peterkin where Macee Peterkin suffered serious bodily injury[1] | |
| 14 | Employing a firearm during the commission of a dangerous felony, no predicate dangerous felony alleged | This count is identical to Count 10 in all respects. |
| 15 | Employing a firearm during the commission of a dangerous felony: no predicate dangerous felony alleged, after having been convicted of a dangerous felony | This count is identical to Count 11 in all respects. |
| 17 | Attempted first degree murder of Aundre Buford | Lesser included offense of Count 21 |
| 18 | Employing a firearm during the commission of a dangerous felony, no predicate dangerous felony alleged | This count is identical to Counts 10 and 14 in all respects. |
| 19 | Employing a firearm during the commission of a dangerous felony: no predicate dangerous felony alleged, after having been convicted of a dangerous felony | This count is identical to Counts 11 and 15. |
| 21 | Attempted first degree murder of Aundre Buford where Aundre Buford suffered serious bodily injury | |
| 22 | Employing a firearm during the commission of a dangerous felony, no | This count is identical to Counts 10, 14, and 18 in all respects. |

[1]    Code section 40-35-501 provides:

There shall be no release eligibility for a person committing attempted first degree murder as defined in § 39-13-202 where the victim suffers serious bodily injury as defined in section 39-11-106, on or after July 1, 2013, until the person has served eighty-five percent (85%) of the sentence imposed by the court less sentence credits earned and retained. However, no sentence reduction credits authorized by section 41-21-236, or any other provision of law, shall operate to reduce below seventy-five percent (75%) the percentage of sentence imposed by the court such person must serve before becoming release eligible.

T.C.A. § 40-35-501(l)(5).

| | | |
|---|---|---|
| | predicate dangerous felony alleged | |
| 23 | Employing a firearm during the commission of a dangerous felony: no predicate dangerous felony alleged, after having been convicted of a dangerous felony | This count is identical to counts 11, 15, and 19 in all respects. |
| 25 | Aggravated assault of John McCamy via "displaying" a deadly weapon and while "acting in concert as defined by T.C.A. 39-12-301, with two or more other persons"[2] | |
| 26 | Aggravated assault of John McCamy via "using" a deadly weapon and while "acting in concert as defined by T.C.A. 39-12-301, with two or more other persons" | Alternative to Count 25 |
| 27 | Aggravated assault of Janae Walker via "displaying" a deadly weapon and while "acting in concert as defined by T.C.A. 39-12-301, with two or more other persons" | |
| 28 | Aggravated assault of Janae Walker via "using" deadly weapon and while "acting in concert as defined by T.C.A. 39-12-301, with two or more other persons" | Alternative to Count 27 |
| 29 | Unlawful possession of a weapon after having been previously convicted of a felony involving the use of force | |
| 30 | Unlawful possession of a weapon after having been previously convicted of a felony involving the use of violence | Alternative to Count 29 |

At the defendant's February 23, 2015 trial, 17-year-old John McCamy testified that on February 4, 2014, Mr. Williams, who was a friend of Mr. McCamy's older brother, telephoned him and asked Mr. McCamy to come to his house. Mr. McCamy agreed, and when he arrived at Mr. Williams' residence, he encountered the defendant, "the unknown, and Mr. Williams." The "unknown," he said, was a black male whom he

---

[2] "A crime of force or violence committed while acting in concert with two (2) or more other persons shall be classified one (1) classification higher than if it was committed alone." T.C.A. § 39-12-302(a).

had never seen before. Mr. McCamy recalled that the defendant and "the unknown" had "guns out" and that "there was another gun on the table." Mr. McCamy said that the defendant, Mr. Williams, and "the unknown" man discussed "going to get some money or do a robbery of some sort." During that discussion, Mr. Williams brought "up the fact that I knew" Aundre Buford. Mr. McCamy testified that he regularly purchased marijuana from Mr. Buford. Mr. McCamy said that Mr. Williams wanted Mr. McCamy to call Mr. Buford "so they can take me to the front door so they can rob him."

Mr. McCamy testified that, at that point, he became "pretty scared" because Mr. McCamy believed that "Mr. Buford had a weapon, possibly, in his house" and that, as a result, he "tried to convince them it was a bad idea." Mr. McCamy said that he did not want to participate in the planned robbery, so he attempted to leave, at which point the defendant "stood up promptly and put a firm hand on my shoulder with his gun in his hand and told me that I was going to do it." Mr. McCamy said that he "was terrified," particularly because he was aware that Mr. Williams was on probation for a conviction related to a home invasion. Mr. McCamy acquiesced to the demand that he call Mr. Buford, and the defendant, Mr. Williams, and "the unknown" man donned rubber gloves and "began to clean off their bullets with towels."

When the men finished their preparatory work, "we exited the apartment complex. And there was one in front of me and two of them behind me. I think their guns were out." Mr. McCamy testified that the four men got into Mr. McCamy's car and that he followed the directions that the men gave him to Mr. Buford's apartment. He said that when they arrived at Mr. Buford's residence in the Fort Sanders area, the defendant told Mr. McCamy to park his car in an alley next to the apartment complex. The men exited Mr. McCamy's car and followed Mr. McCamy up the stairs to Mr. Buford's apartment with "their guns drawn." Mr. McCamy knocked on the door, and, when Mr. Buford asked who was there, Mr. McCamy told "him that it's John. And he let[] me in." Mr. McCamy testified that he could not "recall if I was pushed in or if I walked in" but that "pretty much almost as soon as I get in" "guns were drawn. And I went to the floor in [a] fetal position, absolutely terrified, and then started hearing gunshots."

Mr. McCamy testified that he could not tell from his vantage point which of the men was firing guns. He said that when the gunfire ended, his "ears were ringing very loud. And I just was absolutely stunned and terrified. And I panicked and kind of just started to run." Mr. McCamy recalled hearing a woman's screaming before he ran out of the apartment and down the stairs, where he saw Mr. Buford lying on the ground. Mr. McCamy said that he ran down the alley toward his car but, before he got to the car, the defendant, Mr. Williams, and "the unknown" man "came out of the alleyway" with their guns drawn and began "screaming at me to get in the car. And I'm fumbling with my keys, trying to get the door opened. And I finally get the door open and then they all get in."

The defendant had been shot. As they drove away, the men "were screaming directions at me, cursing me, yelling at me, telling me that I can't tell anyone what happened, that they know where I live and, like, my family and all this stuff, that I can't go to the police or anything." Mr. Williams wanted Mr. McCamy to drive the defendant to the hospital, but Mr. McCamy stopped when he saw an ambulance. Mr. McCamy said that the three men got out of his car, and he "drove just all over, trying to figure out what to do."

Mr. McCamy testified that he eventually went to the home of a friend, where he cleaned the blood out of his car. After cleaning the blood out of his car, Mr. McCamy went home and "cleared all my text messages and phone calls," explaining that he "just panicked. I thought it would be a good idea to just clear it all." These tasks complete, Mr. McCamy revealed the evening's events to his parents, who, in turn, "called our lawyer and then I went and talked to the police." Mr. McCamy also turned his cellular telephone, wiped clean of text messages and call records, over to the police and assisted the State in procuring his cellular telephone records. Those records confirmed that Mr. McCamy and Mr. Williams shared a few calls on the day of the offense and that Mr. McCamy called Mr. Buford at 7:36 p.m., 8:05 p.m., and 8:10 p.m.

During cross-examination, Mr. McCamy testified that he knew a man named Aaron Blance but insisted that he did not know the defendant and that he was unaware of the defendant's familial relationship to Mr. Blance. Mr. McCamy acknowledged that the forensic examination of his cellular telephone indicated that a single contact had been deleted, but he specifically denied having deleted any of his contacts. The global positioning satellite ("GPS") information obtained from Mr. McCamy's cellular telephone for the evening of February 4, 2014, was entered into evidence, as was map information from the Knoxville, Knox County, Knoxville Utilities Board Geographic Information System ("KGIS"). These records, taken together, established that when he first spoke with Mr. Williams, Mr. McCamy was near Legacy Pointe Apartments. He was near Victor Ashe Park at 6:25 p.m. and near Mr. Williams' apartment at 6:35 p.m. The records showed that at 6:57 p.m., Mr. Williams was traveling on I-640 in the opposite direction of Mr. Buford's apartment. At 7:08 p.m., he was at a location in the Cedar Bluff area, where he remained until 7:21 p.m. Ten minutes later, Mr. McCamy was still in the general Cedar Bluff area, this time near Park Village Road. The location information combined with the call records indicated that Mr. McCamy was actually in this general area and not at Mr. Williams' apartment when he first telephoned Mr. Buford at 7:36 p.m. The location records established that Mr. McCamy was in the general location of Mr. Buford's apartment at 13th and Highland at between 8:03 p.m. and 8:11 p.m. Mr. McCamy said that he did not know why the GPS coordinates showed him driving west toward the Cedar Bluff area when he first left Mr. Williams' apartment or why they showed him stopped in that area for several minutes. He denied that he drove to that area for the purpose of selling

pills. He also denied having stolen a handgun from his grandmother to trade to Mr. Buford for drugs on February 4, 2014.

Mr. McCamy testified that, because he closed his eyes for the duration of the encounter inside Mr. Buford's apartment, he could not say how many people were in the apartment when he arrived and could not say how many came in behind him. Mr. McCamy said that Ms. Peterkin was the only person left in the apartment when he left. Mr. McCamy acknowledged that he did not see the defendant shoot anyone and that he specifically did not see the defendant stand over Ms. Peterkin and shoot her in the back. Mr. McCamy also acknowledged that he did not contact the police until four days after the offenses, by which time he knew that the defendant had been arrested and charged in this case.

Aundre Buford testified that he initially moved to Knoxville in 2010 to attend the University of Tennessee and that, after losing his scholarships due to his poor academic performance, he stopped going to school and began selling marijuana out of his apartment at 16th and Highland. Mr. Buford testified that the defendant's "nephew," Aaron Blance, bought marijuana from him regularly and "kicked it at my house a lot." Mr. Buford met the defendant through Mr. Blance and began selling marijuana to the defendant. Mr. Buford testified that in December 2013, he "was robbed by two guys" that the defendant had previously brought to Mr. Buford's apartment to buy marijuana. The men took money and drugs from Mr. Buford at gunpoint, but he did not report the crime to the police. Following that robbery, Mr. Buford moved into a different apartment, cut off all contact with the defendant and Mr. Blance, and obtained a Kimber .45-caliber handgun for his protection. Mr. Buford said that he also purchased .357-, .38-, .40-caliber ammunition to use when he went to the gun range, explaining, "The gun range that I go to, . . . you can buy bullets from there or you can bring your own bullets and it's cheaper to buy your own bullets than purchase theirs from the gun range, so I just got a few bullets to go shoot at the gun range."

Despite having been robbed in the course of dealing drugs, Mr. Buford continued to sell marijuana, and Mr. McCamy was one of his customers. Mr. Buford testified that on February 4, 2014, Mr. McCamy "basically he hit me up . . . to buy some. And I'm not sure exactly . . . why it waited till later for him to come, but throughout the day he hit me up a few more times and then later that day . . . I let him know I was ready." Before Mr. McCamy arrived, Mr. Buford went to get food, and while he was eating his food, two friends of his, Janae Walker and Macee Peterkin, came to his apartment to visit him. A short time after the women arrived, Mr. Buford heard a knock at the door and asked who was there. When he got no response, he looked out the front window but did not see anyone, so he asked again. At that point, someone said, "'Johnny B.,'" and Mr. Buford replied, "You sound like a black guy." Mr. Buford testified that as soon as he "opened the door, that's when like [the defendant] pushed Johnny B. in and came in behind them." Mr.

-7-

Buford tried to push the men "back out the door," but the defendant "broke free and came on in." Mr. Buford immediately reached for his gun, which was on his hip, and the defendant "just started shooting." Mr. Buford said that the defendant did not point his weapon at Mr. Buford but was instead "just waving it around like he was . . . on something that night because he was really, really jittery and like just jumping around." Mr. Buford, too, began firing his weapon and continued to do so until he ran out of bullets. Mr. Buford said that he aimed his weapon at the defendant, saying, "I was trying to shoot him."

Mr. Buford testified that after he ran out of bullets, he ran out the door of his apartment, "fell down the steps," and then heard someone "downstairs yelling, 'Kill that young n*****, kill that young n*****.'" He then was shot again. Mr. Buford said that he did not know how many shots hit him while he was inside the apartment but that shots to his wrist and leg had to have come while he was outside because his leg was broken and the gun knocked out of his hand. After he fell down the stairs, Mr. Buford saw Ms. Walker exit the apartment supporting Ms. Peterkin, who was crying. He then saw Mr. McCamy run down the alleyway followed by Mr. Buford's dog. "After that, there was just the ambulance and the paramedics getting there." Mr. Buford said that, as he lay on a bed in the trauma bay at the hospital, he saw the defendant come in on a stretcher and told the detectives "that's him right there, that's the guy who shot me."

Mr. Buford suffered five gunshot wounds, one of which broke his wrist and another of which shattered a bone in his lower leg, and he spent approximately two weeks in the hospital recovering from his injuries. Mr. Buford admitted that by testifying against the defendant, he had admitted his own participation in several crimes. He said that he had chosen to testify for Ms. Peterkin, saying, "I wouldn't care if he's in jail myself honestly . . . . If it wasn't for Macee then I probably wouldn't be here." Mr. Buford said that he considered himself responsible for Ms. Peterkin's injuries, particularly because he had learned during Mr. Williams' trial that some of his bullets had struck Ms. Peterkin.

During cross-examination, Mr. Buford denied that he harbored any ill will toward the defendant despite the defendant's link to the perpetrators of the December 2013 robbery because the defendant "wasn't the one that actually robbed me." Mr. Buford said that both Ms. Walker and Ms. Peterkin "knew that I had a gun. I mean, they knew why I would have a gun also." He said that he also thought they knew that he sold marijuana. Mr. Buford clarified that the door to his apartment "wasn't kicked in" and that, instead, "once I seen [the defendant] like he was outside of the door and I tried pushing him like out the door, but he's clearly stronger than me so he got in." Mr. Buford said that Mr. McCamy "came in and went straight down." Mr. Buford said that the defendant did not grab him, push him, or place a gun right against his chest. Instead, the defendant pointed a gun in Mr. Buford's direction and told them to get down. Mr. Buford said that, as soon as the defendant saw "me reach, he started shooting."

Mr. Buford testified that he was "pretty sure" that his cellular telephone was in his pocket "when they cut all my stuff off of me" but also agreed that Detective Lee returned the telephone to him. Mr. Buford said that the bullets in his gun and all the .40-caliber bullets in his apartment were hollow point bullets. Mr. Buford conceded that he was shooting at the defendant but said that he "did not take my time and aim down the aim sights or none of that." Mr. Buford said that he could not explain how the defendant was only able to get off five rounds in the same time Mr. Buford fired 10 rounds. Mr. Buford believed that he was shot by the defendant while inside the apartment and by another man while outside the apartment.

Athena Roberts, a trauma core nurse at the University of Tennessee Medical center who treated Mr. Buford, testified that her notes indicated that Mr. Buford suffered two gunshot wounds to his right arm, one gunshot wound to his left ankle, and three gunshot wounds to his right leg.

Janae Walker testified that she met both Mr. Buford and Ms. Peterkin when she moved to Knoxville and enrolled at the University of Tennessee; she and Ms. Peterkin became roommates. On February 4, 2014, Ms. Walker and Ms. Peterkin picked up dinner and then decided to visit Mr. Buford "because we hadn't seen him in a while." Ms. Walker said that they telephoned and asked Mr. Buford if they could come by, and he agreed. When they arrived at his apartment, Mr. Buford was alone with his dog. Ms. Walker said that she and Ms. Peterkin visited with Mr. Buford for approximately 25 or 30 minutes and that when they stood to leave, they "heard a knock on the door." Ms. Walker said that immediately after the knock, a man she later learned was Mr. McCamy "came in" and went to the floor. At that point, Mr. Buford tried "to push the door closed . . . that's when it was like a tussle at the door. And as soon as the tussle, like, started," a black man with "a freshly-lined beard" "pushed the door in and pointed a gun" at Mr. Buford "directly at his chest" and said "you know what it is. Get on the ground or whatever." She saw another black man, whom she described as "taller, and, like, leaner, like, slim, pretty much," standing "in the background, like, near the doorway." Ms. Walker, who had been "standing in the kitchen," "went further back in the kitchen" and "then I heard, like, between 10 to 15 shots go off in the house." She recalled hearing Ms. Peterkin "just screaming, like bloody murder, just screaming" and seeing Mr. McCamy "in the fetal position on the side of the wall. He was right behind me." Ms. Walker said that after the gunfire stopped, she "heard someone walking around" and saw a shadow on the wall. She remained still until she "heard them walk out." At that point, Ms. Walker said, she came out of the kitchen, saw Ms. Peterkin lying on the floor, and realized that Ms. Peterkin had been shot. Ms. Walker said that she helped Ms. Peterkin out of the apartment and that when they walked outside, they saw Mr. Buford lying in a pool of blood.

During cross-examination, Ms. Walker testified that on the night of the offenses, she and Ms. Peterkin left their food in her car while they visited with Mr. Buford for 20 to 30 minutes "having conversation." Ms. Walker said that, when the perpetrators arrived, she had gone into the kitchen to look at the food Mr. Buford had on the stove "because I was going to ask him could I have some, but then I remembered I had my own food in the car so I didn't ask." She clarified that, when the men forced their way into the apartment, she "was not in the kitchen, but I was standing in the doorway." Ms. Walker insisted that she did not know that Mr. Buford had marijuana and a gun in the apartment, despite that photographs showed marijuana and an extra clip for Mr. Buford's gun lying in the apartment. Ms. Walker claimed that Mr. Buford did not receive any calls or text messages before the men arrived at the door. She said that after they heard the knock, Mr. Buford "asked multiple times" who was at the door and looked out the window before opening the door. Ms. Walker testified that she "felt as if the door was kicked in" because there "was a tussle at the door." She said that Mr. McCamy walked into the apartment "on his own power" and then went to the ground "on his own knowingly"; he was not pushed. She said that Mr. Buford and the first man to enter, the one with the freshly-lined beard, engaged in "a shove match" at the door. Ms. Walker conceded that she did not actually see any of the shooting from her place in the kitchen. After the shooting, she used Mr. Buford's cellular telephone to call 9-1-1 and then left the telephone in the apartment when she helped Ms. Peterkin outside. She insisted that she did not know that Mr. Buford had marijuana in the apartment, but she identified a small bag of marijuana on the table and a larger bag of marijuana under the couch. Ms. Walker admitted that when she first spoke with the police, she told them that there was no knock at the door that preceded the perpetrators' entry. She also acknowledged having told the police that the second man had his hood up despite having testified that she knew the second man was black because she saw the back of his neck. She conceded that when the police asked whether the intruders said anything, she told them that they had not. Ms. Walker insisted, however, that she was too concerned with Ms. Peterkin's welfare to provide an accurate statement to the police. She claimed, "What I'm telling you now is correct because the state of mind that I was in and given the emotions and environment that just happened I'm sure I wasn't very concise with my account detail to detail, but I was very clear on what was major to me and what I saw." She admitted having discussed the details of the offenses with Ms. Peterkin, whom she described as her best friend, so many times that she could not be sure of the number.

Macee Peterkin testified that she moved to Knoxville in 2010 to attend the University of Tennessee and that she met Ms. Walker and Mr. Buford shortly thereafter. On February 4, 2014, Ms. Peterkin and Ms. Walker picked up their dinner from a local restaurant and then went to visit Mr. Buford at his apartment. Ms. Peterkin said that they sat for a while, watching a basketball game and talking. As Ms. Peterkin and Ms. Walker prepared to leave, they "heard a knock at the door and it was Mr. McCamy." Mr. Buford let Mr. McCamy in, and, as Mr. Buford "was closing the door, there was someone else on

the other side forcing entry." She said that Mr. McCamy "knelt down in the fetal position near the dog cage" upon entering the apartment. At that point, Ms. Peterkin saw a man enter with a gun in his hand. Ms. Peterkin said that after she "fell to the ground I really didn't see too much of what was going on." She said that "[a]fter the shooting stopped," the man who had initially entered with the gun "then proceeded back into the bedroom. And at this time I tried to crawl into the bathroom." Ms. Peterkin insisted that the man, whom she identified at trial as the defendant, came "running out and that's when he shot me on my back side." She insisted that, despite that she was lying face down on the floor, she saw the defendant before he shot her. She said, "I remember looking up at his face and I just remember like thinking to myself I wasn't going to make it out because he saw me trying to get into the bathroom." She then heard more gunshots outside. After those gunshots stopped, Ms. Walker came out of the kitchen, and Ms. Peterkin asked for her help so that she could leave the apartment. When the women got outside, they "made it down one flight of stairs," where they saw Mr. Buford "slumped over, shot, injured, and he was just telling me how sorry he was that this had happened at his home." The police arrived shortly thereafter and told her to stay where she was. She was transported to the hospital via ambulance. Ms. Peterkin testified that she spent 10 days in the hospital recovering from her injuries, which included "a shattered scapula as well as a shattered collar bone. Six broken ribs. A nicked liver. Collapsed right lung, which the bullet still remains in my right lung."

During cross-examination, Ms. Peterkin testified that Mr. Buford opened the door for Mr. McCamy and that the door to Mr. Buford's apartment was not kicked in. She said that Mr. McCamy walked in "pretty normal. It's nothing that would be out of the ordinary." He was not thrown or shoved into the room. Ms. Peterkin explained that Mr. McCamy had time to greet Mr. Buford but that immediately after that, the defendant attempted to enter, and Mr. Buford attempted to stop him. She said that the defendant went into Mr. Buford's bedroom but did not go into the bathroom. Ms. Peterkin acknowledged that she was not able to identify the defendant as the perpetrator who had entered Mr. Buford's apartment at any time prior to the trial. Ms. Peterkin said that she did not know who fired the first shot. Ms. Peterkin testified that a doctor had told her that a bullet remained inside her right lung and insisted that metal detectors go off when she walks through them. She said that she was positive that the defendant shot her from the front as she stood and that he shot her in the back as she lay face down on the floor.

Wes Chamblee, a core trauma nurse at the University of Tennessee Medical Center, testified that, prior to arriving at the hospital, Ms. Peterkin was assigned the alias "Tango-Tango" because she was a "full alert," which is a patient that "is the most critical -- or has the potential to be most critical." Mr. Chamblee specifically recalled Ms. Peterkin's case because "the number of injuries that she had stood out." He said that he "charted nine wounds or holes" and described them, based upon the information they had

at the time, as gunshot wounds. He recalled that upon her arrival, Ms. Peterkin "was conscious and alert" but "very tachycardic." Hospital personnel took an X-ray, inserted a chest tube, and "took the patient to the operating room as soon as we could."

Knoxville Police Department ("KPD") Investigator Charlie Lee testified that he was dispatched to a call of shots fired at 215 13th street in Knoxville on February 4, 2014. When he arrived at the scene, which he described as "very involved," he saw first responders "coming on the scene and probably one or two patrol units may have beat me there." Investigator Lee observed "numerous cartridge casings" in the parking lot and "laying on the stairwells." He also observed what appeared to be blood. Investigator Lee said that he observed and assisted in the recovery of a .45-caliber handgun that had been "fired till it was empty."

Investigator Lee testified that he found Mr. Buford and Ms. Peterkin on the second level of the apartment building but that he did not attempt to speak with either of them given the extent of their injuries. Investigator Lee then looked into Apartment 20 but did not enter because, at that point, he was unclear to whom the apartment belonged and because he did not want to disturb any potential evidence. He then walked "towards the south end of the building," where he observed "a blood trail" that "kept going towards the . . . railing" and then "over the rail" and on the ground below as well as "blood spray up on the side of the building." He said that "it was kind of evident" that someone had suffered "an artery wound, because that's what you get, you get that hard spray from the blood." The blood trail continued to an area on "the back side of that other apartment building" where it ended abruptly, which indicated to Investigator Lee "that someone got into a vehicle there."

Investigator Lee said that when "another call concerning a gunshot victim" located at the intersection of Highland and 21st Streets came on the radio, he "was very suspicious . . . that there was some kind of connection." He learned from the officers who went to that scene that the gunshot victim, who was later identified as the defendant, had suffered "a pretty good serious wound." Those same officers detained Mr. Williams, who was with the defendant at the time, and brought him to the police station, where Investigator Lee interviewed him.

Investigator Lee testified that he learned from an investigator who was present in the trauma bay where Mr. Buford was being treated that Mr. Buford had identified the defendant as "the person who shot me" when Mr. Buford saw the defendant being "rolled in on a stretcher." Mr. Buford later identified the defendant from a photographic array. Ms. Peterkin was unable to identify the defendant from the lineup on that or any other day.

-12-

During the course of his investigation, Investigator Lee learned that Mr. McCamy had been driving the black truck that had been at the scene. Mr. Buford identified Mr. McCamy from a photographic array as one of the men who had entered his apartment on February 4, 2014. Officers found Mr. McCamy and his vehicle on the evening of February 5, 2014. Mr. McCamy indicated via his attorney that he was unwilling to speak to the police outside the presence of his lawyer.

Investigator Lee interviewed the defendant at the hospital on February 5, 2014. The audio recording of that interview was played for the jury. In that interview, the defendant denied having gone to Mr. Buford's apartment to rob him, denied having shot at anyone, and denied having even possessed a gun.

Investigator Lee interviewed the defendant for a second time on February 7, 2014, at the police department following his release from the hospital. The video recording of that interview was played for the jury. During that interview, the defendant again denied having gone to Mr. Buford's apartment to rob him and denied having possessed a gun. The defendant also claimed to have driven himself to Mr. Buford's apartment and identified a person named "Jamison" as having been involved. Investigator Lee testified that he attempted to locate the man the defendant identified as "Jamison" but was unable to do so. He also could not locate Mr. Blance's car, which the defendant claimed to have driven to Mr. Buford's apartment, in the parking lot. Additionally, Investigator Lee said that he did not recall having seen a car that matched that description in the parking area on the night of the offenses.

Sometime after the offenses, officers with the Oak Ridge Police Department recovered a Ruger P89 9-millimeter handgun from along the bank of Melton Hill Lake. The position of the gun, stuck into the ground, indicated that it "had been thrown with some force" from the nearby roadway. That weapon was sent to the Tennessee Bureau of Investigation ("TBI") for testing to determine whether it bore any connection to this case.

During cross-examination, Investigator Lee testified that he returned Mr. Buford's cellular telephone to him at the hospital despite that a search warrant had been issued for Mr. Buford's apartment that specifically included cellular telephones. He said that it was his recollection that he had obtained all the information he needed from the cellular telephone before he returned it. Investigator Lee conceded that he did not record the interviews he conducted of Mr. Buford or Ms. Peterkin while they were in the hospital and that he elected to record his interview with the defendant despite that the defendant was gravely injured and under the effects of pain medication. By that point, the defendant was the primary suspect, and warrants had been issued for his arrest. Investigator Lee said that he had "no doubt that [the defendant] was on some kind of pain medication" at the time of his interview on the night of the offense but insisted that the defendant "seemed

-13-

coherent." Investigator Lee agreed that it was possible that the defendant had been given pain killers upon his release from the hospital immediately before the interview at the police station on February 7, 2014. He acknowledged that the defendant told him during the February 7 interview that he was scared. Investigator Lee said that, "from the beginning," Mr. McCamy's "statement was more plausible" than the statements provided by the defendant and Mr. Williams, which statements he described as "somewhat outlandish or . . . vague at times." Investigator Lee conceded that Mr. McCamy admitted that he cleaned the blood out of his truck and "erased some things off his phone" before going to the police. Despite these actions, Mr. McCamy was not charged with evidence tampering.

KPD Evidence Technician Beth Goodman, who responded to the scene, testified that when she arrived, she observed a large number of shell casings, "a weapon in the parking lot," and two victims being attended by EMS personnel. Ms. Goodman noted "lots of bullet fragments, bullet casings, bullet defects or holes in windows and walkway railings." She described the scene as "one of the hardest . . . I have ever had to work, to describe where things are" because of the layout of the apartment complex and the sheer volume of evidence spread "pretty much on almost every level of the building, either or up or down or on the stairs." She testified that the weapon found in the parking lot was "a .45-caliber Kimber" with an empty magazine. She said that all the bullets, fragments, and shell casings found outside were .40 caliber. Upon entering Mr. Buford's apartment, Apartment 20, Ms. Goodman observed that "there was blood in the apartment, there were casings . . . , [and] bullet fragments inside the apartment." She said that the shell casings found inside Apartment 20 were .45 caliber and 9 millimeter. She observed a magazine on the coffee table that contained seven .45-caliber cartridges.

Ms. Goodman testified that on the following day, she went to 2104 Cove View Road in Knoxville to recover, transport, and process a GMC Denali that investigators believed to be connected with this case. She noted numerous reddish-brown stains that appeared to be blood both inside and outside the vehicle. She swabbed those areas and sent the swabs to the TBI for testing. She later went to the University of Tennessee Medical Center, where she collected bullet fragments that had been recovered by doctors who operated on Ms. Peterkin. She noted that emergency personnel found a "bullet that actually still ha[d] the jacket on it" when transporting Ms. Peterkin to the hospital. While at the hospital, she also collected the clothing worn by Mr. Buford.

During cross-examination, Ms. Goodman agreed that Kimber brand handguns tend to be nicer weapons. She said that the magazine discovered on the coffee table was Kimber brand and that the bullets in that magazine were hollow points. Ms. Goodman testified that the magazine found inside the Kimber was longer and stamped Wilson Combat. Ms. Goodman said that a total of nine .45-caliber casings and five 9-

millimeter casings were found inside Apartment 20; no .40-caliber casings were found inside the apartment.

KPD Crime Scene Technician Danielle Wieberg responded "to a secondary scene at 2103 Highland," where she "photographed that area and collected some evidence from that location." As part of her duties that evening, Ms. Wieberg followed a blood trail from the primary scene to an area behind a house at 1409 Highland, where "the blood trail ended right next to [some] tire treads." She collected clothing belonging to Mr. Williams, which included a pair of jeans that had what appeared to be blood on them. She said that a pair of clear latex gloves were found in his pocket. She participated in the execution of a search warrant at Mr. Williams' residence, where officers found an unfired .40-caliber bullet "in one of the closets in the dining room."

KPD Firearms Examiner Patricia Resig examined Mr. Buford's Kimber .45-caliber handgun, the 9-millimeter handgun discovered by the Oak Ridge Police Department, and the numerous bullets, bullet fragments, and cartridge casings recovered during the investigation of this case. Ms. Resig's examination established that all the .45-caliber casings recovered from the scene had been fired from the same Kimber .45 auto caliber pistol, as had, indeed, all of the .45-caliber bullets and bullet fragments. The Kimber bullets were all of the hollow-point variety, which, she explained, means that the nose of the bullets was designed to "mushroom back or peel back," which, in turn, "make[s] the wound channel larger." She determined that the "bullet found by EMS during transport" of Ms. Peterkin was "a fired .45 auto caliber bullet" that had been fired through "the barrel of the submitted firearm, .45 caliber Kimber pistol." She said that four bullet portions were recovered during Ms. Peterkin's surgery: "One is a fired bullet portion, a .45 auto caliber. One is a fired bullet jacket fragment, one is a fired bullet jacket fragment, and the other one's a fired bullet core fragment." Ms. Resig determined that the remaining bullet portions "could have been part of one bullet" and that it was likely fired through the .45 auto caliber Kimber.

Ms. Resig testified that the 13 .40-caliber cartridge casings recovered from the scene were likely fired by a .40-caliber Glock firearm, noting that they bore indicia that indicated that they had been fired from a Glock firearm. She determined that five of the .40-caliber casings had been fired "in the same unknown gun" and that, while the remaining eight .40-caliber casings shared "similar class characteristics to the first group of .40-caliber casings, I could not match the two groups together, which might suggest there were two probable Glock firearms involved." The "fired .40/10 millimeter caliber . . . jacket" that was recovered by the personnel transporting Ms. Peterkin to the hospital bore the polygonal rifling typically seen "in Glock and a few other guns." Ms. Resig testified that a bullet fragment found beneath Mr. Buford's clothing also displayed the polygonal rifling that "can be consistent with a Glock."

-15-

Ms. Resig said that nine cartridge casings from the scene "could have been fired through the barrel of the submitted firearm, which is a 9-millimeter Ruger semi-automatic pistol. But there wasn't enough of those individual characteristics for me to say with 100 percent certainty that it was fired through the barrel of that gun." None of the bullets or fragments recovered during Ms. Peterkin's transport or treatment were 9-millimeter.

TBI Special Agent and Forensic Scientist Jennifer Millsaps determined that the DNA profile from blood taken from the railing outside of Apartment 6, the brick landscaping outside Apartment 5, the ground outside Apartment 7, the window of Apartment 6, footprints at both 1309 Highland Avenue and 1323 Highland Avenue, the Clorox wipes container taken from Mr. McCamy's truck, and the inside of Mr. McCamy's truck matched the defendant's DNA profile. She testified that testing established the presence of human DNA on the grips and trigger of the 9-millimeter pistol recovered during the investigation but that, "[d]ue to the complex nature and unknown number of potential contributors to this profile, further interpretation was inconclusive." Swabs taken "from all other areas except the grips and trigger" of that same firearm were presumptively positive for the presence of blood, but "[f]urther testing did not indicate the presence of human hemoglobin, a component of human blood." She said that a partial DNA profile obtained from the swabs of those areas contained "a mixture of at least two individuals," with the defendant being the major contributor.

The defendant stipulated that he had a previous felony conviction involving force and a previous felony conviction involving violence.

Doctor Steven Cogswell, Deputy Chief Medical Examiner for Hamilton County, testified on behalf of the defendant. Doctor Cogswell said that he had reviewed Ms. Peterkin's medical records and had determined, based upon his review of those records, that Ms. Peterkin "was shot a maximum of six times, which produced multiple actual defects because some of these gunshot wounds are what we call perforating, that is, they pass entirely through the body." Ms. Peterkin suffered "a total of four perforating wounds, which, obviously, comprise eight defects," and two penetrating wounds. Doctor Cogswell testified that it was possible that Ms. Peterkin had been shot fewer than six times because the placement of the defects in the pants she wore at the time of the shooting suggested that the perforating, or through-and-through, wounds on her legs could have been caused by "one bullet passing through her left leg and then through her right leg and continuing on." He said that his review of her medical records indicated that she did not suffer any "front-to-back gunshot wounds." A gunshot to Ms. Peterkin's back traveled "a little bit forward and upward," "passing along the rib cage, but not actually entering into the body cavity. . . . breaking the ribs and . . . causing a laceration of the liver, but it's sort

-16-

of skimming past them" and coming to rest in her chest wall. A second wound to Ms. Peterkin's back traveled "forward, breaks up the shoulder girdle, actually hit the bones that hold the shoulder intact and hold it together, and then fragments. And those fragmented bits of the bullet are actually in that area underneath the scapular spine." Doctor Cogswell testified that he could not discern the direction of a wound to Ms. Peterkin's left flank, saying that the bullet could have "passe[d] downward and backward through the buttock -- or conversely, it could be entering the left buttock and passing upward and forward and out the front or the flank on the left-hand side." Ms. Peterkin suffered "a perforating wound of the lower abdomen" that "skim[med] across the front and just goes through skin and subcutaneous fat and then exits." Doctor Cogswell said that that bullet traveled sideways, but he could not discern "whether it's coming from left to right or right to left." The wound to Ms. Peterkin's left leg was "a shallow kind of wound, like the one on the abdomen. It goes only through skin and the subcutaneous tissue and then exits the leg." The wound on her "right thigh actually went through skin, subcutaneous tissue and muscle and got through the muscle of the leg and then exited out."

Doctor Cogswell said that nothing in Ms. Peterkin's medical records indicated that a bullet remained in her lungs. He added, "There may be some small fragments that still remain in her lungs. . . . I also have not seen any X-rays. So it's entirely possible that there is a bullet fragment still remaining in Ms. Peterkin's lung." A radiologist's report from a CT scan performed on Ms. Peterkin on February 5, 2014, indicated that "a large bullet fragment remains embedded in the right, upper chest wall beneath the pectoralis major" but not in the lung. Additionally, "the right scapular spine is also fragmented next to a residual bullet fragment" and "that's in the shoulder girdle itself."

During cross-examination, Doctor Cogswell testified that, although Ms. Peterkin did not suffer any life-threatening injuries, "she would suffer some significant debility" if her injuries were not repaired. He said that, even without medical treatment,

> [i]t's unlikely that she would have died, necessarily, none of the bullets having struck large blood vessels, so she wouldn't bleed to death. But, ultimately, without repair of the rib fractures and the shoulder girdle, she would have had significant debility. And without some support for her ventilation, her ability to breathe, while these rib fractures were healing, she certainly may well have gone on to die. She would not have died, most likely, very quickly, within a matter of minutes or hours, but over the course of a few days, she may well have gone into extremis and died.

Doctor Cogswell agreed that Ms. Peterkin's records indicated a bruise to her lung, but he clarified that no bullet actually struck Ms. Peterkin's lung, explaining that, instead, "a combination, both, of the cavitation surrounding the bullet and the rib fragments coming in or pushing into the chest that are going to cause the underlying lung, which is right under the ribs, to get a bruise on it." He said that the bruise to her lung would have made it difficult for Ms. Peterkin to breathe. Doctor Cogswell agreed that Ms. Peterkin's claim that the defendant stood over her and shot her while she lay on the floor was possible but pointed out that "the retained bullets, the bullets that were taken out of her were .45s." He conceded that it was possible that some of her wounds were inflicted while she lay on the floor because his description of wound trajectory "is based on standard anatomic position," "which is standing upright, arms down by your sides and palms forward."

During redirect examination, Doctor Cogswell said that only one of Ms. Peterkin's wounds could have been inflicted by the defendant while she was lying completely prone on her stomach, explaining:

> Well, given the scenario . . . where he's shooting straight down, . . . if we assume that the two bullets recovered from . . . the wounds in the shoulder area, and those were both .45s, then, obviously, a 9 millimeter cannot shoot a .45-caliber bullet. So we've ruled out those two.
>
> The wounds on the abdomen and on the legs are taking a horizontal pathway. So if she's laying prone on the ground, that is face down on the ground, we can rule out those two. One, her belly is in contact with the ground, so you can't get a gunshot wound there. The other, that would require a horizonal pathway parallel to the floor and low down.
>
> So we're left with one gunshot wound. That is the wound that's in the left flank and left buttock area. So that wound could have been incurred while she's prone on the ground with a 9 millimeter and it would be taking a forward and upward and somewhat leftward pathway. Because the entrance there -- given that scenario, the entrance wound would have to be on the buttock, as opposed to the flank. And so it would have to be passing forward. And so that could certainly occur with her prone, and be inflicted by a 9 millimeter from somebody standing over her.

Mr. Buford testified that he did not run out of the apartment after the defendant took cover in the bathroom "because I wasn't done shooting at him . . . . I had bullets left." Mr. Buford said that he was so focused on shooting the defendant that he did not realize that he had shot Ms. Peterkin.

The defendant testified that he did not possess a firearm at any point on February 4, 2014, and that he did not enter Mr. Buford's house and try to shoot him. The defendant acknowledged that he was not forthcoming during his interviews with the police. He said that Mr. McCamy had been Mr. Williams' "best friend since they were in, like, middle school" while he and Mr. McCamy were merely acquaintances at the time of the offenses. The defendant said that he met Mr. Buford through his "little cousin" Mr. Blance. The defendant said that on the night of the offenses, he met Mr. McCamy "to give him some pills" because Mr. McCamy "uses drugs. I mean, I sold him the pills." After that, the defendant, and Messrs. Williams and McCamy went to Mr. Williams' residence in Mr. McCamy's truck. The defendant "and Mr. McCamy sat in the car in the parking lot" smoking marijuana "while Mr. Williams went into the home to change his clothes because he just got off of work." The defendant maintained that he did not go into Mr. Williams' residence that day and that he certainly did not go inside to don rubber gloves and wipe down bullets. When Mr. Williams returned to the car, the trio "went out west, because Mr. McCamy knew some more friends of his that wanted to buy some more pills. So we rode out West Knoxville, out Cedar Bluff area." The defendant testified that the men stopped at a McDonald's to sell pills to a couple of Mr. McCamy's friends before going to Executive Park near the Warren House Apartments to wait on another potential customer who never arrived.

The defendant recalled that as the men waited for Mr. McCamy's customer to arrive, Adarius Boatwright approached them and asked if they had any marijuana to sell.[3] The men told Mr. Boatwright that they did not have any marijuana, but Mr. McCamy told Mr. Boatwright, "basically, just, well, I'm going over to meet my friend, so you can just ride with us." The defendant testified that Mr. McCamy "had stolen a firearm from his grandmama or something to that nature. He stole a firearm from her and he was going to trade it to Mr. Buford for some pot." The defendant said that he did not tell the police that Mr. Boatwright had accompanied them to Mr. Buford's apartment because he was afraid of Mr. Boatwright. The defendant claimed that he knew "Mr. Boatwright to be a dangerous man" who would not hesitate to "kill me, he'll kill my family. He's a leader of gang members, sir. He runs a gang. And I didn't want to say nothing about that." The defendant said that he "didn't want to be labeled a snitch or somebody that say something about these individuals and put my family in harm's way," reiterating, "I knew however it

---

[3]    Mr. Boatwright was shot and killed by a man named Marquail Patterson at a Knoxville nightclub in July 2014. *See State v. Marquail Patterson*, No. E2019-01139-CCA-R3-CD (Tenn. Crim. App., Knoxville, June 15, 2020).

came about if I put his name in this incident, that man would have killed my family, man. I know he would have."

The defendant testified that he did not initially realize that the friend from whom Mr. McCamy intended to purchase pot was Mr. Buford and said that if he had known, "I probably wouldn't have got into the car with him" because Mr. Buford "feels like I had something to do with him in a prior incident, which I don't." The defendant said that Mr. McCamy drove to Mr. Buford's apartment of his own volition. He recalled that as they walked toward the apartment, Mr. McCamy called Mr. Buford and told him that they were on their way up, and Mr. Buford responded that the door was open. The defendant claimed that when they got to the apartment, the door "was cracked, like, a little bit." He said that he was the last to enter the apartment and that Mr. Buford recognized him just as Mr. McCamy "was going for the firearm that he was attempting to sell" to Mr. Buford. According to the defendant, at that point, Mr. Buford "just hopped up and he shot" in "the general direction of the door." The defendant testified that when Mr. Buford began firing, he "basically beelined and just ran for cover. I was scared. I was trying to get out of his line of fire." He said that he could not run out the door because that was the direction of Mr. Buford's shots. As he took cover behind a wall, he saw Mr. Boatwright "firing into the living room."

The defendant testified that he initially realized that he had been shot when he was behind the wall, saying that the front of his leg felt "really hot, but it was cold at the same time." The defendant said that he "took a couple of steps into the bathroom" and saw "Mr. Boatright come out of the bedroom and run into the living room. He comes out of the room and he, like, picks up a firearm and runs out the front door." The defendant "believe[d] that it was the firearm that Mr. McCamy had in his console, the one that I had seen." The defendant insisted that he did not shoot Ms. Peterkin and that he did not even have a gun. The defendant said that after the shooting stopped inside the apartment, he ran out the door and across the parking lot and eventually got back into Mr. McCamy's truck. Mr. Williams was already in the truck; Mr. Boatright got into the truck just as the defendant did. The defendant testified that, after that, he "kind of just faded out" and was "dipping in and out of consciousness."

The defendant admitted that he lied to the police during both of his interviews. He stated that he was fearful of Mr. Boatwright. Additionally, he "was very intoxicated" from the pain medication he was receiving when he first spoke to Investigator Lee at the hospital. When he was released from the hospital, "the lady gave me some medication, because she said I was going to be going with the police for an interview and so I need to take my medication." The defendant admitted that he wanted to talk to Mr. Williams while they were both in jail to discuss "this incident, you know, his friend Mr.

McCamy." I just wanted to let him know the situation, what was going on, what was being said." He said, "I just wanted to warn him about the court proceeding, that's it."

During cross-examination, the defendant testified that he did not assist Mr. Buford in finding the people who had robbed Mr. Buford in December 2013 because he believed that Mr. Buford would do something violent to them, and he did not want to be involved. The defendant said that he had known Mr. Boatwright since he "was still young enough to go to the playground" and that Mr. Boatwright's "mentality made him violent."

Based upon this evidence, the jury convicted the defendant as charged on all counts. Following a sentencing hearing, the trial court imposed the following sentences:

| Count(Merged Counts) | Sentence | RED | Alignment |
|---|---|---|---|
| 1(5) | Class C, 8 years | 35 | Consecutive to Count 19 |
| 3(2,6,7) | Class C, 10 years | 100 | Consecutive to Count 1 |
| 13(9) | Class A, 20 years | 85 | Lead sentence |
| 15(10,11,14) | Class C, 10 years | 100 | Consecutive to Count 13 |
| 21(17) | Class A, 20 years | 85 | Consecutive to Count 11 |
| 23(18,19,22) | Class C, 10 years | 100 | Consecutive to Count 17 |
| 26(25) | Class B, 15 years | 35 | Concurrent with Count 1 |
| 28(27) | Class B, 15 years | 35 | Concurrent with Count 1 |
| 30(29) | Class C, 8 years | 35 | Concurrent with Count 1 |

The total effective sentence imposed by the trial court was 78 years, with 30 years to be served at 100 percent release eligibility, 40 years to be served at 85 percent release eligibility, and eight years to be served at 35 percent release eligibility.

In this timely appeal, the defendant contends that the trial court erred by permitting the prosecutor to read portions of the co-defendant's inadmissible hearsay statement during her cross-examination of the defendant and argues that the evidence was insufficient to support his convictions of attempted first degree murder. We consider each claim in turn.

*I. Cross-Examination of the Defendant*

Prior to trial, the State moved the trial court to sever the defendant's trial from Mr. Williams'. Mr. Williams did not testify at the defendant's trial. During her cross-examination of the defendant, the prosecutor attempted to "impeach" the defendant purportedly using a statement that Mr. Williams provided to the police following his arrest. The prosecutor asked the following questions and made the following remarks with regard to Mr. Williams' statement:

Q.      Got you.   Now, again, during the course of discovery, you are aware of Mr. Joshua Williams' statement that he gave to Investigator Lee, right?

A.      When . . . he talked -- I wasn't with him when he talked to Mr. Lee.

Q.      No.  No.  I'm saying, in the course of receiving discovery, like all this stuff that we've introduced to the jury, you've known about, right?   Like the photographs, you've seen; the recorded statements of the witnesses, you've heard --

A.      Yes.

Q.      -- right?

A.      Yes, to a degree.

Q.      You've heard Mr. Williams' statement, right? Both of his statements?

A.      No.  I haven't -- haven't heard them personally, but I was aware that he made two statements.  I seen it on that piece of paper that you gave, yes, ma'am.

Q.      So you are not aware that Mr. Williams admits to going up to the apartment complex?

A.      No, ma'am.  I was not aware of that.

Q.      You're not aware --

A.      Excuse me.  Like I told you, . . . I didn't see him go up to the apartment.  He didn't tell me he went up to the apartment, and so . . .

Q.      So you're not aware that Mr. Williams admits to going up to the apartment complex with you?

Q.      No, ma'am.  I was unaware of that.

Q.      And as far as you know, that didn't happen, right?

A.      Correct.

Q.      He wasn't out there with you?

A.      No.  He didn't walk up there with me.

Q.      Are you aware that Mr. Williams admits --

The defendant objected, arguing that this back-door attempt to admit Mr. Williams' clearly inadmissible statement violated not only the hearsay rule but also the defendant's constitutional right to confront the witnesses against him.  The prosecutor inexplicably argued that the defendant had "opened the door" to her "impeaching his statement" with the contents of Mr. Williams' statement.  After denying the defendant's request for a jury-out hearing on the basis that he did not want to unnecessarily prolong the trial and risk "losing" the jury, the trial court ruled that the line of questioning could continue because the prosecutor had "enjoined . . . the facts and circumstances that are consistent with his testimony."  Much of this discussion is inaudible, making it clear that a jury-out hearing in open court should have been granted to preserve the record for our review.  The defendant moved for a mistrial on grounds that the line of questioning violated the Confrontation Clause and that the court's refusal to permit him to be heard in a jury-out hearing violated principles of due process.  The trial court denied the motion, and the prosecutor continued her line of questioning:

Q.      Are you aware that Mr. Williams has admitted that -- in his statement to Charles Lee --

A.      No, ma'am.

Q.      --that Exhibit 203 --

A.      No, ma'am.

Q.      -- that this was his toboggan that he was wearing?

A.      No, ma'am.  No, ma'am.

-23-

Q.     And you're aware -- because I know you paid attention to the evidence -- that this is the toboggan --

A.     That --

Q.     -- that was found --

A.     When I --

Q.     Okay.  Well, were you aware that this was the toboggan that was found in the apartment complex?

. . . .

Q.     All right.  Now, additionally, you were not aware that Mr. Williams admitted to going up to the apartment with you?

A.     No.

Q.     And were you aware that Mr. Williams didn't say anything at all about Adarius Boatwright being there with y'all?

A.     I can't account for what Mr. Williams did or did not say, ma'am.  I was not there.  So I don't -- I don't know what you want me to say.  I don't -- I wasn't there --

Q.     No.  No.

A.     I don't know what he told him, or him, or her, or none of them.  I wasn't there, so I couldn't tell you.  I didn't watch the tape.  He hasn't showed me any tape that this is Mr. Williams talking to Mr. Lee or Mr. Terry, no, ma'am.  I don't know.  I don't know.

Q.     I'm just --

A.     I simply don't know.

-24-

Q. Yes sir.
I'm just pointing out some things.

. . . .

Q. And I'm just pointing out that you're saying some things that are different than what other people have said.

. . . .

Q. And are you aware that Mr. Williams admits to being there in that location?

A. Once again --

Q. Are you aware?

A. When? When would I be aware of Mr. Williams admitting to this?

At the conclusion of the trial, the defendant asked the trial court to reiterate its ruling regarding the prosecutor's using Mr. Williams' statement to question the defendant. The trial court stated:

The Court ruled, first of all, that the . . . Court felt it was justified for the State to bring that up in view of other hearsay testimony that had previously been admitted.

The Court also found that there was not a Sixth Amendment confrontation right, a *Crawford* violation because the testimony of -- in reference to the testimony of Mr. Williams, that he did go up on the landing, was not, in any way, accusatory of the defendant, it didn't accuse him of doing anything wrong. Obviously, was not prepared for . . . this litigation and was not testimony of a nature, he simply -- the statement alluded to was simply an admission on Mr. Williams' part that he did go up, at least -- and participated in the robbery, at least to the point of getting to the door with the others.

And the Court will stand by that ruling.

The defendant contends that the trial court erred by permitting the State to "clearly relate" Mr. Williams' statement via the cross-examination of the defendant, in

violation of his right to confront the witnesses against him. The State argues that because the remarks of counsel are not evidence, the prosecutor's use of Mr. Williams' out-of-court statements to cross-examine the defendant did not violate the rule against hearsay or the defendant's confrontation right.

## A.  Impeachment

Following the defendant's initial objection, the prosecutor indicated that her purpose in confronting the defendant with Mr. Williams' statement was to impeach the defendant with Mr. Williams' statement. Her argument in this regard, however, indicates a misunderstanding of the concept of impeachment by a prior inconsistent statement.

Mr. Williams' statement does not fall within the ambit of Rule 613 because it cannot qualify as a prior inconsistent statement by the defendant because it is not a statement made by the defendant. At most, Mr. Williams' statement would be proof that Mr. Williams told the police that he went up to Mr. Buford's apartment, contrary to the defendant's testimony that Mr. Williams had remained in the car. Thus, the only possible use of the statement was to impeach the defendant through fact contradiction, a device that is recognized by our courts. *See, e.g.*, *State v. Jeremy Sims and Sherry Brookshire*, No. W2013-01253-CCA-R3-CD, slip op. at 20 (Tenn. Crim. App., Jackson, Sept. 25, 2015); *see also, e.g.*, *State v. McKinney*, 74 S.W.3d 291, 317 (Tenn. 2002) (appendix). Fact contradiction is a long-standing impeachment device that is indigenous to cross-examination and enjoys implied currency in our rules of evidence; it emanates simply from the power to attack a witness's credibility as expressed in Tennessee Rule of Evidence 607. *See* Neil P. Cohen et al., *Tennessee Law of Evidence* § 6.07[4][a] (6th ed. 2011). Through fact contradiction, a cross-examining party inquires about facts that conflict with the witness's testimony to show indirectly that the witness is untruthful. *See id.* Importantly, however, fact contradiction as a method of impeachment is generally limited to "challeng[ing] the accuracy of any *relevant* facts during cross-examination." *See id.*, § 6.07[b]. Relevant evidence is evidence "having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. "Evidence which is not relevant is not admissible." Tenn. R. Evid. 402. What Mr. Williams told the police about his location during the offenses did not make any fact of consequence *in the defendant's trial* more or less probable, and, in consequence, it was irrelevant.

## B.  Hearsay/Confrontation Clause

"'Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Tenn. R. Evid. 801(c). "Hearsay is not admissible except as provided by these

rules or otherwise by law." *Id.* 802. Tennessee Rules of Evidence 803 and 804 provide exceptions to the general rule of inadmissibility of hearsay.

Our supreme court has confirmed that "[t]he standard of review for rulings on hearsay evidence has multiple layers." *Kendrick v. State*, 454 S.W.3d 450, 479 (Tenn. 2015). The "factual and credibility findings" made by the trial court when considering whether a statement is hearsay, "are binding on a reviewing court unless the evidence in the record preponderates against them." *Id.* (citing *State v. Gilley*, 297 S.W.3d 739, 759-61 (Tenn. Crim. App. 2008)). "Once the trial court has made its factual findings, the next questions—whether the facts prove that the statement (1) was hearsay and (2) fits under one [of] the exceptions to the hearsay rule—are questions of law subject to de novo review." *Kendrick*, 454 S.W.3d at 479 (citing *State v. Schiefelbein*, 230 S.W.3d 88, 128 (Tenn. Crim. App. 2007); *Keisling v. Keisling*, 196 S.W.3d 703, 721 (Tenn. Ct. App. 2005)); *see also Gilley*, 297 S.W.3d at 760 (stating that because "[n]o factual issue attends" the trial court's determination whether a statement is hearsay, "it necessarily is a question of law"). "If a statement is hearsay, but does not fit one of the exceptions, it is inadmissible, and the court must exclude the statement. But if a hearsay statement does fit under one of the exceptions, the trial court may not use the hearsay rule to suppress the statement." *Kendrick*, 454 S.W.3d at 479; *see also Gilley*, 297 S.W.3d at 760-61.

In addition to the ban on hearsay found in the rules of evidence, the Sixth Amendment to the federal constitution and article I, section 9 of the Tennessee Constitution afford the criminal accused the right to confront the witnesses against him. *See* U.S. Const. amend. VI; Tenn. Const. art. I, § 9. Although the provisions are not coterminous, our supreme court has "expressly adopted and applied the same analysis used to evaluate claims based on the Confrontation Clause of the Sixth Amendment." *State v. Dotson*, 450 S.W.3d 1, 62 (Tenn. 2014) (citing *State v. Parker*, 350 S.W.3d 883, 898 (Tenn. 2011); *State v. Franklin*, 308 S.W.3d 799, 809-10 (Tenn. 2010); *State v. Cannon*, 254 S.W.3d 287, 301 (Tenn. 2008); *State v. Lewis*, 235 S.W.3d 136, 145 (Tenn. 2007)). In *Crawford v. Washington*, the United States Supreme Court departed from decades-long precedent and held for the first time that "[w]here testimonial evidence is at issue . . . the Sixth Amendment demands . . . unavailability and a prior opportunity for cross-examination." *Crawford v. Washington*, 541 U.S. 36, 68 (2004). "Where nontestimonial hearsay is at issue, it is wholly consistent with the Framers' design to afford the States flexibility in their development of hearsay law." *Id.* Because the Confrontation Clause does not bar nontestimonial hearsay, *see Davis v. Washington*, 547 U.S. 813, 823-24 (2006); *Whorton v. Bockting*, 549 U.S. 406, 420 (2007), "the threshold question in every case where the Confrontation Clause is relied upon as a bar to the admission of an out-of-court statement is whether the challenged statement is testimonial." *Dotson*, 450 S.W.3d at 63 (citing *Cannon*, 254 S.W.3d at 301).

The *Crawford* court identified, for illustrative purposes, a "core class of 'testimonial' statements": "ex parte in-court testimony or its functional equivalent—that is, material such as affidavits, custodial examinations, prior testimony that the defendant was unable to cross-examine, or similar pretrial statements that declarants would reasonably expect to be used prosecutorially"; "extrajudicial statements . . . contained in formalized testimonial materials, such as affidavits, depositions, prior testimony, or confessions"; and "statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial." *Crawford*, 541 U.S. at 51-52 (alteration in original) (citations omitted). Similarly, the court observed that some "statements . . . by their nature were not testimonial," including, among other things, "business records." *Id.*; *Dotson*, 450 S.W.3d at 64. The Supreme Court has also recognized that "medical reports created for treatment purposes . . . would not be testimonial." *Melendez-Diaz v. Massachusetts*, 557 U.S. 305, 312 n.2 (2009); *see also Cannon*, 254 S.W.3d at 303 (statements in medical records given for the primary purpose of medical diagnosis and treatment are nontestimonial). Thus, statements that are properly categorized as business records or medical records are nontestimonial, and the Confrontation Clause has no application to their admission into evidence. *Cannon*, 254 S.W.3d at 303.

For those statements that are not easily classified as nontestimonial, our supreme court has concluded that "a statement is testimonial at least when it passes the basic evidentiary purpose test plus either the . . . targeted accusation requirement" adopted by the plurality of the Supreme Court in *Williams v. Illinois*, 567 U.S. 50 (2012), or the "formality criterion" espoused by Justice Thomas in his concurring opinion in *Williams*, stating that "[o]therwise put, . . . an out-of-court statement is testimonial . . . if its primary purpose is evidentiary and it is either a targeted accusation or sufficiently formal in character." *Dotson*, 450 S.W.3d at 69 (quoting *Young v. United States*, 63 A.3d 1033, 1043-44 (D.C. 2013)).

Without question, Mr. Williams' statement qualified as hearsay. Moreover, the value of the statement lay in its truth because the prosecutor's purpose in referencing the statement was to imply that the defendant's own testimony was untrue. Furthermore, there can be no serious question but that the primary purpose of Mr. Williams' statement to the police qualified as testimonial under the loose framework announced in *Williams* and adopted in *Dotson*. Indeed, "material such as . . . custodial examinations" and "extrajudicial statements . . . contained in formalized testimonial materials, such as . . . confessions" were included in the list of a "core class of 'testimonial' statements." *See Crawford*, 541 U.S. at 51-52. Thus, the statement itself was clearly inadmissible. Here, however, the State did not actually seek admission of the statement but instead used its contents to question the defendant. Although it is true that "the statements made by counsel during the course of a hearing, trial, or argument" are not evidence, *see State v. Roberts*,

755 S.W.2d 833, 836 (Tenn. Crim. App. 1988), this court has previously held that "a cross-examination in extensive detail about a witness's prior statement is tantamount to an introduction of the statement," *State v. Vaughan*, 144 S.W.3d 391, 408 n.2 (Tenn. Crim. App. 2003) (permitting the introduction of the balance of witness's statement under evidence rule 106 where witness was cross-examined about statement but statement was not offered into evidence); *see also State v. Belser*, 945 S.W.2d 776, 788 (Tenn. Crim. App. 1996); *State v. Dylan Brewer*, No. W2017-01725-CCA-R3-CD, 2019 WL 1109917, at *14 (Tenn. Crim. App., Jackson, Mar. 11, 2019). Thus, the prosecutor's extensive questioning of the defendant with the contents of Mr. Williams' inadmissible statement was tantamount to the admission of the statement itself. In essence, the State took evidence that was clearly inadmissible as part of its case in chief and impermissibly "tried to smuggle it in on cross-examinaton" of the defendant. *Walder v. United States*, 347 U.S. 62, 66 (1954).

That being said, because the evidence of the defendant's guilt was substantial and because neither Mr. Williams' location during the offenses nor the ownership of the toboggan was particularly consequential, it is our view that the error was harmless beyond a reasonable doubt. *See Coy v. Iowa*, 487 U.S. 1012, 1021 (1988) ("We have recognized that other types of violations of the Confrontation Clause are subject to that harmless-error analysis, *see e.g., Delaware v. Van Arsdall*, 475 U.S. [673, 679, 684 (1986)], and see no reason why denial of face-to-face confrontation should not be treated the same.").

## II. Sufficiency

The defendant contends that the evidence was insufficient to support his convictions of attempted first degree murder because the State failed to present any evidence of premeditation. Sufficient evidence exists to support a conviction if, after considering the evidence—both direct and circumstantial—in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Tenn. R. App. P. 13(e); *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011). This court will neither re-weigh the evidence nor substitute its inferences for those drawn by the trier of fact. *Dorantes*, 331 S.W.3d at 379. The verdict of the jury resolves any questions concerning the credibility of the witnesses, the weight and value of the evidence, and the factual issues raised by the evidence. *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978). Significantly, this court must afford the State the strongest legitimate view of the evidence contained in the record as well as all reasonable and legitimate inferences which may be drawn from the evidence. *Id.*

As charged in this case, "[f]irst degree murder is . . . "[a] premeditated and intentional killing of another." T.C.A. § 39-13-202(a)(1). As used in Code section 39-13-202,

"premeditation" is an act done after the exercise of reflection and judgment. "Premeditation" means that the intent to kill must have been formed prior to the act itself. It is not necessary that the purpose to kill preexist in the mind of the accused for any definite period of time. The mental state of the accused at the time the accused allegedly decided to kill must be carefully considered in order to determine whether the accused was sufficiently free from excitement and passion as to be capable of premeditation.

T.C.A. § 39-13-202(d). Criminal attempt is committed when a person, "acting with the kind of culpability otherwise required for the offense," does one of the following:

> (1) Intentionally engages in action or causes a result that would constitute an offense, if the circumstances surrounding the conduct were as the person believes them to be;
>
> (2) Acts with intent to cause a result that is an element of the offense, and believes the conduct will cause the result without further conduct on the person's part; or
>
> (3) Acts with intent to complete a course of action or cause a result that would constitute the offense, under the circumstances surrounding the conduct as the person believes them to be, and the conduct constitutes a substantial step toward the commission of the offense.

*Id.* § 39-12-101(a).

Noting that "[p]roof of premeditation is inherently circumstantial," this court has observed that "[t]he trier of fact cannot speculate what was in the killer's mind, so the existence of premeditation must be determined from the defendant's conduct in light of the circumstances surrounding the crime." *State v. Gann*, 251 S.W.3d 446, 455 (Tenn. Crim. App. 2007). Thus, when evaluating the sufficiency of proof of premeditation, the appellate court may look to the circumstances surrounding the killing. *See, e.g., State v. Bland*, 958 S.W.2d 651, 660 (Tenn. 1997); *State v. Coulter*, 67 S.W.3d 3, 72 (Tenn. Crim. App. 2001). Such circumstances may include "the use of a deadly weapon upon an unarmed victim; the particular cruelty of the killing; declarations by the defendant of an intent to kill; evidence of procurement of a weapon; preparations before the killing for concealment of the crime[;] and calmness immediately after the killing." *Bland*, 958 S.W.2d at 660.

The defendant argues that the State failed to establish that he acted with premeditation with regard to either Mr. Buford or Ms. Peterkin, pointing to testimony that he fired his weapon in response to Mr. Buford's firing his own weapon. He contends that he "reacted in self-defense" and that he was "not 'sufficiently free from excitement or passion'" when he fired his weapon inside the apartment. He also asserts that the State failed to establish that he acted with the intent to kill Ms. Peterkin because the only bullet from his gun that arguably struck Ms. Peterkin caused a wound to her "back side," arguing that "[s]hooting a person in the buttocks does not show an intent to kill."

*Mr. Buford*

The evidence in this case, examined in the light most favorable to the State, established that the defendant, Mr. Williams, and a third man concocted a plan to use Mr. McCamy's relationship with Mr. Buford to create a ruse to gain entry into Mr. Buford's apartment for the purpose of robbing him. To this end, the men armed themselves with handguns and forced Mr. McCamy to first arrange a meeting with Mr. Buford and then drive the men to Mr. Buford's apartment. All did not go according to plan. As soon as he saw the defendant, Mr. Buford raised his own weapon, and the defendant began shooting. Mr. Buford returned fire, and he candidly admitted that he intended to kill the defendant. Mr. Buford continued to fire his weapon until the clip was empty, and then he ran outside. Outside, Mr. Buford heard someone, presumably one of the perpetrators, shout, "'Kill that young n*****,'" before he was shot in the wrist and leg. This evidence evinces both premeditation and an intent to kill on the part of the shooter. No evidence suggested that the defendant planned to kill Mr. Buford, and Mr. Buford testified that the defendant did not actually aim his weapon at Mr. Buford but was "just waving it around like he was . . . on something that night because he was really, really jittery and like just jumping around." Nevertheless, we conclude that the evidence was sufficient to support a finding of guilt based upon the defendant's criminal responsibility for the actions of his cohorts because the shooting of Mr. Buford was a natural and probable consequence of the planned armed home invasion robbery. *See State v. Dickson*, 413 S.W.3d 735, 744 (Tenn. 2013) (holding that "[a] natural and probable consequence of [Dickson's] attempt to obtain money and drugs by force was the shooting of two unarmed victims").

"A person is criminally responsible as a party to an offense, if the offense is committed by the person's own conduct, by the conduct of another for which the person is criminally responsible, or by both." T.C.A. § 39-12-401. "[C]riminal responsibility is not a separate, distinct crime" but is instead "a theory by which the State may prove the defendant's guilt of the alleged offense . . . based upon the conduct of another person." *State v. Lemacks*, 996 S.W.2d 166, 170 (Tenn. 1999). Criminal responsibility "is a codification of the common-law theories of aiding and abetting and accessories before the

-31-

fact." *Id.* at 171 (citing *State v. Carson*, 950 S.W.2d 951, 955 (Tenn. 1997)). "No particular act need be shown, and the defendant need not have taken a physical part in the crime in order to be held criminally responsible." *State v. Caldwell*, 80 S.W.3d 31, 38 (Tenn. Crim. App. 2002). Criminal responsibility "requires that a defendant act with a culpable mental state, [*i.e.*], the 'intent to promote or assist the commission of the offense or to benefit in the proceeds or results of the offense.'" *Carson*, 950 S.W.2d at 954 (quoting T.C.A. § 39-11-402(2) (1991)). The "natural and probable consequences rule," which "survived the codification of the common law into the criminal responsibility statutes," "extends the scope of criminal liability to the target crime intended by a defendant as well as to other crimes committed by a confederate that were the natural and probable consequences of the commission of the original crime." *State v. Howard*, 30 S.W.3d 271, 276 (Tenn. 2000) (citing *Carson*, 950 S.W.2d at 954-55). The defendant and his confederates armed themselves and forced their way into Mr. Buford's apartment for the purpose of robbing him. At least one of those confederates declared an intent to kill Mr. Buford before firing a gun at Mr. Buford. Although Mr. Buford was armed with the Kimber .45, he had run out of ammunition and was attempting to flee the scene when he was shot outside his apartment. These facts support a conclusion that the attempt on Mr. Buford's life was premeditated. *See Bland*, 958 S.W.2d at 660.

### Ms. Peterkin

The defendant argues that because he did not know Ms. Peterkin would be at Mr. Buford's apartment, because the State could tie him to only one of her wounds, and because a gunshot aimed at the buttock does not evince an intent to kill, the evidence was insufficient to support his conviction of the attempted first degree murder of Ms. Peterkin. No evidence suggested that the defendant knew that Ms. Peterkin and Ms. Walker would be at Mr. Buford's apartment. Indeed, Mr. Buford, Ms. Walker, and Ms. Peterkin testified that the women decided at the last minute to visit Mr. Buford on their way home from picking up their dinner. Forensic evidence suggested that Mr. Buford actually inflicted the majority of Ms. Peterkin's wounds. Indeed, Dr. Cogswell testified that only one of Ms. Peterkin's wounds could have occurred as a result of someone firing at her "backside" as she lay prone on the ground and that, "given that scenario, the entrance wound would have to be on the buttock." We disagree with the defendant, however, that these facts prevent a finding that the defendant acted with the intent to kill Ms. Peterkin. Examined in the light most favorable to the State, the evidence established that the defendant, Mr. Williams, and a third man, armed with handguns and acting in concert, forced their way into Mr. Buford's apartment, where a gunfight ensued. During the barrage, Ms. Peterkin suffered a number of gunshot wounds. Ms. Peterkin testified that the defendant stood over her and fired a single shot at her as she lay on the ground. Firing a gun at a clearly wounded and bleeding

victim while she lays prostrate certainly supports a finding that the defendant attempted a premeditated and intentional killing.[4]

*Firearms Convictions*

Although the defendant does not challenge the sufficiency of the evidence with regard to his remaining convictions, we perceive an insufficiency of the evidence supporting the defendant's convictions of employing a firearm during the commission of a dangerous felony after having been previously convicted of a dangerous felony. Code section 39-17-1324 provides that the offense of employing a firearm during the commission of a dangerous felony "is a Class C felony, punishable by a mandatory minimum six-year sentence to the department of correction," unless "the defendant, at the time of the offense, had a prior felony conviction," in which case it "is a Class C felony, punishable by a mandatory minimum ten-year sentence to the department of correction." T.C.A. § 39-17-1324(a), (h)(1)-(2). Code section 39-17-1324 also provides that "prior conviction" for purposes of the statute "means that the person serves and is released or discharged from, or is serving, a separate period of incarceration or supervision *for the commission of a dangerous felony* prior to or at the time of committing a dangerous felony on or after January 1, 2008." *Id.* § 39-17-1324(i)(2)(A) (emphasis added). That term also "includes convictions under the laws of any other state, government or country that, if committed in this state, *would constitute a dangerous felony*." *Id.* § 39-17-1324(i)(2)(B) (emphasis added). The statute also defines "dangerous felony":

> (i) As used in this section, unless the context otherwise requires:
> (1) "Dangerous felony" means:
> (A) Attempt to commit first degree murder, as defined in §§ 39-12-101 and 39-13-202;
> (B) Attempt to commit second degree murder, as defined in §§ 39-13-210 and 39-12-101;
> (C) Voluntary manslaughter, as defined in § 39-13-211;
> (D) Carjacking, as defined in § 39-13-404;

---

[4]     The State argued at trial that the defendant was responsible for the gunshot wounds that Mr. Buford inflicted on Ms. Peterkin because Mr. Buford's shooting Ms. Peterkin was a natural and probable consequence of the planned home invasion robbery, arguing during closing, "And under criminal responsibility, whether the bullets that are in Ms. Peterkin come from Mr. Buford or whether they come from [the defendant], he is responsible, because, but for him entering the apartment, it never would have happened." This is a misstatement of law because, as indicated, the natural and probable consequences rule is a function of criminal responsibility for the crimes committed "by a confederate." *See Howard*, 30 S.W.3d at 276. Because Mr. Buford was not the defendant's confederate, the defendant cannot be held responsible for his actions.

(E) Especially aggravated kidnapping, as defined in § 39-13-305;

(F) Aggravated kidnapping, as defined in § 39-13-304;

(G) Especially aggravated burglary, as defined in § 39-14-404;

(H) Aggravated burglary, as defined in § 39-14-403;

(I) Especially aggravated stalking, as defined in § 39-17-315(d);

(J) Aggravated stalking, as defined in § 39-17-315(c);

(K) Initiating the process to manufacture methamphetamine, as defined in § 39-17-435;

(L) A felony involving the sale, manufacture, distribution or possession with intent to sell, manufacture or distribute a controlled substance or controlled substance analogue defined in part 4 of this chapter; or

(M) Any attempt, as defined in § 39-12-101, to commit a dangerous felony;

*Id.* § 39-17-1324(i)(1).

The most basic principle of statutory construction is " 'to ascertain and give effect to the legislative intent without unduly restricting or expanding a statute's coverage beyond its intended scope.'" *Houghton v. Aramark Educ. Res., Inc.*, 90 S.W.3d 676, 678 (Tenn. 2002) (quoting *Owens v. State*, 908 S.W.2d 923, 926 (Tenn. 1995)). "Legislative intent is determined 'from the natural and ordinary meaning of the statutory language within the context of the entire statute without any forced or subtle construction that would extend or limit the statute's meaning.'" *Osborn v. Marr*, 127 S.W.3d 737, 740 (Tenn. 2004) (quoting *State v. Flemming*, 19 S.W.3d 195, 197 (Tenn. 2000)). "When the statutory language is clear and unambiguous, we apply the plain language in its normal and accepted use." *Boarman v. Jaynes*, 109 S.W.3d 286, 291 (Tenn. 2003) (citing *State v. Nelson*, 23 S.W.3d 270, 271 (Tenn. 2000)). "It is only when a statute is ambiguous that we may reference the broader statutory scheme, the history of the legislation, or other sources." *In re Estate of Davis*, 308 S.W.3d 832, 837 (Tenn. 2010) (citing *Parks v. Tenn. Mun. League Risk Mgmt. Pool*, 974 S.W.2d 677, 679 (Tenn. 1998)). Importantly, "[e]very word in a statute 'is presumed to have meaning and purpose, and should be given full effect if so doing does not violate the obvious intention of the Legislature.'" *Waters v. Farr*, 291 S.W.3d 873, 881 (Tenn. 2009) (quoting *In re C.K.G.*, 173 S.W.3d 714, 722 (Tenn. 2005)).

Code section 39-17-1324 specifically defines a "prior conviction" using the term "dangerous felony," which is itself defined within the statute as any one of 12 specific felony offenses. The defendant had prior convictions of aggravated assault and attempted robbery, neither of which is included in the list of dangerous felonies. Another panel of

-34-

this court confronted with the same issue determined, "based on the statutory language and the history of the legislation, that a 'prior felony conviction,' as the term is used in subsections (f), (g)(2), and (h)(2), must be for a dangerous felony under the statute." *Josh L. Bowman v. State*, No. E2016-01028-CCA-R3-PC, slip op. at 7 (Tenn. Crim. App., Knoxville, Apr. 24, 2017). The *Josh L. Bowman* panel examined the legislative history of the act, observing that, although "the bill was initially drafted so that the qualifying prior felony was not required to be a dangerous felony under the statute and so that the definition in subsection (i) was for a '[p]rior felony conviction' rather than for a '[p]rior conviction,'" subsequent amendments retained "the phrase 'prior felony conviction,' in subsections (f), (g), and (h)," but "changed the statutory definition from a '[p]rior felony conviction' in subsection (i) . . . to a '[p]rior conviction,' the language which ultimately survives in subsection (i) of the statute" and which "restricts 'prior convictions' to previous convictions 'for the commission of a dangerous felony.'" *Id.*, slip op. at 9-10. The panel concluded that the General Assembly intended "to revise the bill to require the prior conviction to be for a dangerous felony but neglected to change the language in subsections (f), (g)(2), and (h)(2) to conform with the revisions." *Id.*, slip op. at 10. The panel also noted that Code section 39-17-1324(f) requires the trier of fact to determine whether the defendant "had a prior qualifying conviction," leading "to the inference that the prior conviction must be for a dangerous felony." *Id.*, slip op. at 11.

We find the reasoning of the *Josh L. Bowman* panel to be sound and hold that the defendant's prior convictions of aggravated assault and attempted robbery are not qualifying convictions for the sentence enhancement in Code section 39-17-1324(h)(2) because they are not included in the list of dangerous felonies in Code section 39-17-1324(i). Accordingly, the evidence was insufficient to support the defendant's convictions in Counts 3, 7, 11, 15, 19, and 23, and, in consequence, the defendant's convictions in those counts are vacated and dismissed. The pair of convictions of employing a firearm during the commission of a dangerous felony in Counts 2 and 6 that were lesser included offenses of Counts 3 and 7 survive as a single conviction of employing a firearm during the commission of aggravated burglary.[5] The pair of convictions of employing a firearm during the commission of a dangerous felony in Counts 10 and 14 that were lesser included offenses of Counts 11 and 15 survive as a single conviction of employing a firearm during the commission of the attempted murder of Ms. Peterkin.[6] Finally, the pair of convictions for employing a firearm during the commission of a dangerous felony in Counts 18 and 22 that were lesser included offenses of Counts 19 and 23 survive as a single conviction of employing a firearm during the commission the attempted murder of Mr. Buford.[7] We remand the case to the trial court for the entry of corrected judgment forms reflecting the

---

[5]     Count 7 was merged into Count 3 by the trial court.

[6]     Count 11 was merged into Count 15 by the trial court.

[7]     Count 19 was merged into Count 23 by the trial court.

proper merger of these convictions and the imposition of a six-year mandatory minimum period of incarceration. *See* T.C.A. § 39-17-1324(h)(1).

At this point, we would be remiss not to address the form of the indictment in this case. The State elected to charge as 24 separate counts nine offenses: especially aggravated burglary, attempted first degree murder of Aundre Buford, attempted first degree murder of Macee Peterkin, aggravated assault of John McCamy, aggravated assault of Janae Walker, employing a firearm during the commission of the especially aggravated burglary and the two attempted murders, and having been a felon in possession of a firearm. Eight counts of the indictment charge four single offenses by alternative means: (1) Counts 1 and 5 charge especially aggravated burglary, (2) Counts 25 and 26 charge aggravated assault of Mr. McCamy, (3) Counts 27 and 28 charge aggravated assault of Ms. Walker, and (4) Counts 29 and 30 charge the defendant with having been a felon in possession of a firearm. The Code provides, however, that "[w]hen the offense may be committed by different forms, by different means or with different intents, the forms, means or intents may be alleged in the same count in the alternative." T.C.A. § 40-13-206(a); *see also id.* § 40-18-112.[8] Counts 2 and 6 are identical in all respects, as are Counts 3 and 7; Counts 10, 14, and 18; and Counts 11, 15, and 19. Code section 40-13-202 requires that an indictment "state the facts constituting the offense in ordinary and concise language, without prolixity or *repetition*, in a manner so as to enable a person of common understanding to know what is intended and with that degree of certainty which will enable the court . . . to pronounce the proper judgment." T.C.A. § 40-13-202 (emphasis added). Counts 2, 6, 9, 10, 14, 17, 18, and 22 charge lesser included offenses of other counts within the indictment and, as a result, need not have been pleaded separately because they were, by definition, included within the greater charge. *See id.* § 40-18-110.

Charging a single offense in more than one count of an indictment results in multiplicity. *See United States v. Webber*, 255 F.3d 523, 527 (8th Cir. 2001) (citing *United States v. Ketchum*, 320 F.2d 3, 8 (2d Cir.), *cert. denied*, 375 U.S. 905 (1963)); *see also United States v. Rimell*, 21 F.3d 281, 287 (8th Cir. 1994) (citing *Gerberding v. United States*, 471 F.2d 55, 58 (8th Cir. 1973)). Two concerns arise when jurors are permitted to consider multiplicitous charges. *See State v. Desirey*, 909 S.W.2d 20, 27 (Tenn. Crim.

---

[8]     Code section 40-18-112 provides:

      "Where the intent with which, the mode in, or the means by which, an act is done are essential to the commission of the offense, and the offense may be committed with different intents, in different modes, or by different means, if the jury is satisfied that the act was committed with one (1) of the intents, in one (1) of the modes, or by either of the means charged, the jury shall convict, although uncertain as to which of the intents charged existed, or which mode, or by which of the means charged, the act was committed."

T.C.A. § 40-18-112.

App. 1995). First, multiplicity "can lead to multiple convictions and punishment for only one offense." *State v. Whitmore*, No. 03C01-9404-CR-00141, 1997 WL 334904, at *9 (Tenn. Crim. App., Jackson, June 19, 1997) (citing *Desirey*, 909 S.W.2d at 27 (citations omitted)). The potential for multiple punishments can be, as it was in this case, cured by a merger of offenses. That being said, the necessity of merging multiple jury verdicts presents opportunity for error, as evidenced in this case by the fact that the trial court had to enter three separate sets of corrected judgments to address errors attributable to merger. As a result of the multiplicitous indictment in this case, the judgment forms and corrected judgment forms account for nearly 10 percent of the technical record.

Second, and perhaps more insidious, "multiplicity may carry the potential of unfair prejudice, such as suggesting to the jury that a defendant is a multiple offender or falsely bolstering the state's proof on such issues as the defendant's motive or knowledge of wrongdoing." *Whitmore*, at *9.

> The prosecution's ability to bring multiple charges increases the risk that the defendant will be convicted on one or more of those charges. The very fact that a defendant has been arrested, charged, and brought to trial on several charges may suggest to the jury that he must be guilty of at least one of those crimes. Moreover, where the prosecution's evidence is weak, its ability to bring multiple charges may substantially enhance the possibility that, even though innocent, the defendant may be found guilty on one or more charges as a result of a compromise verdict.

*Ball v. United States*, 470 U.S. 856, 867-68 (1985) (Stevens, J., dissenting). Indeed, even when "multiplicitousness never places a defendant in jeopardy of multiple sentences, the prolix pleading may have some psychological effect upon a jury by suggesting to it that defendant has committed not one but several crimes." *United States v. Mamber*, 127 F. Supp. 925, 927 (D. Mass. 1955); *see also, e.g.*, *United States v. Sue*, 586 F.2d 70, 71-72 (8th Cir. 1978). Because of the potential for error, multiplicity should be avoided whenever possible. We have noted before the disconcerting trend toward overly-complicated and voluminous indictments and have expressed concern that indictments of this kind serve no legal purpose and instead serve only to invite confusion and error. Indeed, there is some evidence in this case that the proverbial piling on of unnecessary counts of the indictment operated to prejudice the defendant because he was convicted of all charged offenses despite that the evidence was insufficient to support six of those offenses. To compound matters, the trial court rejected all efforts to improve the indictment. The defendant tried to challenge the indictment prior to trial, arguing correctly that the defendant's convictions of attempted robbery and aggravated assault did not qualify as prior convictions for the

purposes of the sentencing enhancement in Code section 39-17-1324.  The trial court, swayed by the State's misreading of the statute, rejected the argument.

*III.  Conclusion*

The trial court erred by permitting the State to cross-examine the defendant using the statement of his co-defendant, but that error can be classified as harmless beyond a reasonable doubt.  The evidence was sufficient to support the defendant's convictions of the attempted first degree murder of Mr. Buford and Ms. Peterkin.  Because the defendant's previous felony convictions do not qualify as prior convictions under the terms of Code section 39-17-1324, the defendant's convictions of employing a firearm during the commission of a dangerous felony after having been previously convicted of a dangerous felony in Counts 3, 7, 11, 15, 19, and 23 are vacated and dismissed.  The pair of convictions of employing a firearm during the commission of a dangerous felony in Counts 2 and 6 that were lesser included offenses of Counts 3 and 7 survive as a single conviction of employing a firearm during the commission of aggravated burglary.  The pair of convictions of employing a firearm during the commission of a dangerous felony in Counts 10 and 14 that were lesser included offenses of Counts 11 and 15 survive as a single conviction of employing a firearm during the commission of the attempted murder of Ms. Peterkin.  The pair of convictions of employing a firearm during the commission of a dangerous felony in Counts 18 and 22 that were lesser included offenses of Count 19 and 23 survive as a single conviction of employing a firearm during the commission of the attempted murder of Mr. Buford.  The case is remanded to the trial court for the entry of corrected judgment forms reflecting the proper merger of these convictions and the imposition of a six-year mandatory minimum period of incarceration.  *See* T.C.A. § 39-17-1324(h)(1).  The judgments of the trial court are otherwise affirmed.

_____
JAMES CURWOOD WITT, JR., JUDGE